IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

SEP 27 2006

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

TERENCE G. FLANAGAN,

        Plaintiff,

v.

GENERAL MOTORS CORPORATION,
GENERAL MOTORS ACCEPTANCE
CORPORATION, and GENERAL MOTORS
ISUZU COMMERCIAL TRUCK, LLC,

        Defendants.

CIVIL ACTION NO.

1:04-CV-3498-JEC

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

SEP 27 2006

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

**ORDER & OPINION**

    This case is presently before the Court on Defendants' Motion for Summary Judgment [30].  The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that Defendants' Motion for Summary Judgment should be **GRANTED in part and DENIED in part**.

**BACKGROUND**

    Plaintiff Terence G. Flanagan brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et. seq.*  Plaintiff worked for defendant General Motors Acceptance Corporation ("GMAC") from October 5, 1981 until January

13, 1995, and again from January 2, 1996 until May 31, 2002.[1] (Administrative Record ("AR") [32-33] at 293; Defs.' Separate and Concise Statement of Material Facts, etc. ("DSMF") [30] at ¶ 6.)   In May, 2002, GMAC informed plaintiff that he would be laid off unless he accepted a transfer to Dallas, Texas.   Although the parties dispute whether this termination of plaintiff from his Atlanta-based sales consultant position should be characterized as a lay-off or a resignation, they agree that, as of June 2002, plaintiff no longer worked for GMAC. (DSMF at ¶ 7; Pl.'s Resp. to Defs.' Statement of Material Facts ("Resp. DSMF") [39] at ¶ 7.)

Prior to leaving GMAC, plaintiff was given three options. First, as noted, plaintiff was offered a comparable job in Dallas, Texas with a complete relocation package. (DSMF at ¶ 8.)   Second, plaintiff was offered benefits under a Layoff Alternative Program ("LAP") established by defendant General Motors Corporation ("GM").[2] (Id.)   Third, plaintiff was offered benefits under GM's Layoff

---

[1]   The dates of plaintiff's employment cited by defendants in their statement of undisputed facts are inaccurate.  Though these inaccurate dates of employment were "admitted" by plaintiff in his response to defendants' statement of undisputed facts, the Court has gone to the administrative record to insure that the dates of employment cited in this Order are accurate.  The employment dates cited here are the dates listed repeatedly throughout the administrative record.

[2]   It is the Court's understanding that GMAC is a subsidiary of GM, the parent company.

2

Benefit Plan ("LBP"). (Resp. DSMF at ¶ 8.)  Plaintiff says that he rejected the Dallas position and did not seek LAP and LBP benefits because GMAC management led him to believe that he was ineligible to receive such benefits. (*Id.* at ¶ 9.)

### A.   Layoff Alternative Program

LAP was a special leave of absence program made available  from January 1, 2001 through December 31, 2002. (AR at 1.)  LAP provided for salary continuation for any GMAC employee with one or more years "length of service" who signed a LAP agreement agreeing to separate from GMAC employment upon expiration of the leave of absence. (*Id.*) The duration of the leave-with-salary benefit varied, depending on the employee's length of service.  Benefits ranged from three months paid leave for those employees with one to two years of service, up to six months for those employees with ten or more years of service. (*Id.*)  Under the terms of the program, employees separating under LAP were not eligible to be re-employed in any capacity by "GM, its subsidiaries, affiliated companies or companies in which GM has an ownership interest." (*Id.*)

### B.   Layoff Benefit Program

Under LBP, any employee with one or more years length of service who is placed on "Layoff-Class I" status receives a monthly layoff benefit, for the first six months of LBP entitlement, in an amount, which, when added to any other compensation, would  equal 75% of that

3

employee's monthly base salary as of the last day he worked for GM prior to layoff. (AR at 23.)   During the second six months of LBP entitlement, the monthly layoff benefit drops to an amount which, when added together with any other compensation received, would total 60% of the employee's monthly base salary. (*Id.*)   Any employee with ten or more years "length of service," as of his or her last day of work, then receives an additional twelve months of LBP entitlement at 60% of the employee's monthly base salary. (*Id.*)

### C.   Plaintiff's Next Step

No longer with GMAC, on June 3, 2002, plaintiff started a new position as a regional fleet manager with Isuzu Motors America ("Isuzu America"). (AR at 517.)   On May 28, 2002, plaintiff had signed an acceptance letter for this position, which opens, "This letter is to confirm your acceptance of our offer of employment and to welcome you to Isuzu Motors America . . . To reiterate the terms of our employment agreement, we are offering you a position as Regional Fleet Manager with Isuzu Motors America," (emphasis added).

As indicated in the signed acceptance letter, as a regional fleet manager, plaintiff was assigned to the "GMICT National Fleet Operations" department. (AR at 517.)   GMICT stands for "General Motors Isuzu Commercial Truck, LLC." (*Id.* at 707.)   Defendants[3]

---

[3] The defendants have filed a joint motion for summary judgment.

4

assert that GMICT has, at all times, been a joint venture of GM and various Isuzu entities, with Isuzu holding a majority interest and GM a minority interest. (AR at 707; DSMF at ¶ 21.)  Collectively, all defendants assert that GMICT has never had employees of its own, but instead it is staffed with employees of GM and Isuzu. (DSMF at ¶ 22.) Plaintiff argues, however, that GMICT did have its own employees. (Resp. DSMF at ¶ 22.)  Plaintiff points to five pieces of evidence in an effort to support his argument that he was employed by GMICT. (AR at 278-79.)  Defendants counter with three.

### D.   Evidence Relied Upon by Plaintiff to Support the GMICT Employment Argument

First, plaintiff points to a notice sent to him from GM's National Benefit Center indicating that plaintiff accrued eleven months of service in 2003. (AR at 280-81.)  Because plaintiff had been on assignment with GMICT in 2003, plaintiff cites this benefits accrual notice as evidence that he was actually employed by GMICT.[4] Second, plaintiff points to an inter-office memorandum on GMICT letterhead discussing plaintiff's continuing deficient work

---

[4]   On May 26, 2004, GMAC sent plaintiff a letter indicating that the notice indicating plaintiff had accrued eleventh months of service in 2003 was the result of administrative error.  GMAC said, "In response to the notice received by Mr. Flanagan from the GM National Benefit Center . . . the information contained in that notice was incorrect due to administrative error.  We appreciate you bringing this matter to our attention as his Credited Service with General Motors has now been corrected." (AR at 258.)

AO 72A
(Rev.8/82)

performance.  (AR at 282-83.)  Plaintiff also relies on his May 2002 acceptance letter to argue that he was employed by GMICT rather than Isuzu. (AR at 270.)  Ignoring the letter's statement that "we are offering you a position as Regional Fleet Manager with Isuzu Motors America," plaintiff maintains that the letter's reference to him being assigned to GMICT's National Fleet Operation department, coupled with its instructions to plaintiff to attend new hire orientation at GMICT's Southeast Region office, establishes that plaintiff was an employee of GMICT, not Isuzu America.  Fourth, plaintiff relies on a letter distributing bonuses for 2002 as proof that plaintiff was an employee of GMICT. (AR at 272.)  Specifically, this letter is addressed "Dear GMICT Associate," refers to "the entire management team of GMICT," and is signed by James Underwood as "President and Chief Operating Officer" of GMICT. (*Id.*)  Finally, plaintiff points to his business card as proof that he was employed by GMICT because it lists plaintiff as "Terry Flanagan, General Motors Isuzu Commercial Truck, LLC" and includes a gm.com e-mail address for plaintiff. (*Id.* at 273.)

### E.   Evidence Relied Upon by Defendants to Support the Isuzu Employment Argument

In response, defendants maintain that GMICT had no employees and, specifically, that plaintiff was employed, not by GMICT, but by Isuzu America. (AR at 293; DSMF at ¶ 9.)  In support of their

AO 72A
(Rev.8/82)

position, defendants point, first, to the May 2002 acceptance letter signed by plaintiff. Specifically, defendants rely on the letter's statements welcoming plaintiff to "Isuzu Motors America" and confirming an offer for "a position as Regional Fleet Manager with Isuzu Motors America." (AR at 517.) Second, defendants note that all of plaintiff's W-2 forms and payroll checks list "American Isuzu Motors, Inc.," with Isuzu's Federal tax identification number, as plaintiff's employer.[5] (*Id.* at 581-654.) Finally, as proof that plaintiff was an employee of Isuzu America, defendants point out that while working on behalf of GMICT, plaintiff participated in benefit plans provided by Isuzu America, not GM. (DSMF at ¶ 11.) To explain these benefits, plaintiff received copies of Isuzu Companies' Retirement Plan, Isuzu Motors America, Inc.'s Business Travel Accident Insurance Plan, and the Summary Plan Description for the Isuzu Companies' Savings Plan. (*Id.* at ¶¶ 12-14.) The Retirement Plan made no mention of GM, GMAC, or the GM Retirement Program. *Id.* at 13. The Savings Plan Description lists the participating companies and identifies both the Plan Sponsor and the Plan Administrator. The Savings Plan Description likewise contains no mention of GM or GMAC. (*Id.* at ¶ 15.)

---

[5] Plaintiff admits that his W-2 forms and payroll checks list "American Isuzu Motors, Inc." under employer's name, but nevertheless denies that this is the entity that actually employed plaintiff. (Resp. DSMF at ¶ 10.)

AO 72A
(Rev.8/82)

In response to defendants' assertions concerning plaintiff's participation in Isuzu benefit plans, plaintiff admits that he received the summary plan description for all the above Isuzu plans when he commenced his employment in June, 2002. (Resp. DSMF [39] at ¶ ¶ 11-12). Plaintiff further admits that he participated in Isuzu benefit plans while employed with Isuzu America/GMICT.[6] (*Id.* at ¶ 11). Notwithstanding the availability of, and his participation in, Isuzu benefit plans while employed there, plaintiff contends that this fact does not preclude him from participating in the GM LAP or LBP plans in April 2002, prior to his arrival at Isuzu America, or from receiving benefits from the GM Retirement Program or GM Salaried Employee Benefit Plans, as a result of his employment with Isuzu America/GMICT. *(Id.* at ¶ 14).

**F.   Plaintiff's Termination from Isuzu**

On December 17, 2003, plaintiff was notified that his position with Isuzu America was being eliminated, effective December 31, 2003. (*Id.* at ¶ 23.) Plaintiff initially signed a severance benefits letter that provided for a severance payment of $4,314 if plaintiff

---

[6]   Defendants contend that plaintiff was employed by Isuzu America from June 2002 until December 31, 2003, albeit assigned to the GMICT department during his employment. Plaintiff contends that he was actually employed by GMICT during this time. Accordingly, the Court sometimes refers to plaintiff's employer as Isuzu America/ GMICT. Sometimes, the Court refers to plaintiff's employer as Isuzu America, as this is the entity with which plaintiff had an employment agreement and which paid plaintiff's salary.

8

released all Isuzu entities from any and all claims, known or unknown. (*Id.* at ¶ 24.)  Later, plaintiff rescinded his release. This rescission by plaintiff constituted a  rejection of the severance payment offered by Isuzu. (*Id.* at ¶ 25.)

### G.   Request for GM Benefits

On January 16, 2004, plaintiff contacted Human Resources at GMAC to request benefits under LAP and LBP. (DSMF at ¶ 26; Resp. DSMF at ¶ 26.)  On January 28, 2004, GMAC's Human Resources Manager sent a letter to plaintiff indicating that GMAC was unable to accommodate plaintiff's "request for a severance package." (DSMF at ¶ 30.)  On March 10, 2004, plaintiff's attorney wrote a letter to GMAC to request certain documents and to appeal GMAC's denial of plaintiff's request for benefits. (*Id.* at ¶ 31.)  On March 26, 2004, another GMAC Human Resources Manager wrote to plaintiff's attorney to acknowledge plaintiff's request for an appeal of GMAC's denial of severance benefits. (*Id.* at ¶ 32.)  On April 8, 2004, GMAC Vice President G.G. Tosch sent a letter informing plaintiff that his appeal had been denied.   In relevant part, the letter denying plaintiff's appeal provides:

> A review of the facts shows that Mr. Flanagan was employed with GMAC twice.  He was first employed with GMAC on October 5, 1981 and quit on January 13, 1995 to pursue other career interests.  Mr. Flanagan was rehired with GMAC on January 2, 1996, and his last position was as the Municipal Sales Manager for the Commercial Services Group key-pointed in Atlanta.   Due to changing business

9

conditions, Mr. Flanagan was notified during the first quarter of 2002 that his position in Atlanta would be eliminated.

On April 9, 2002, Mr. Flanagan was offered a position in Dallas effective June 1, 2002 at the same level with no loss in pay. The position in Dallas included a complete relocation package in accordance with our policy. Mr. Flanagan was advised that should he choose not to accept the job in Dallas, he could either elect the Layoff Alternative Program (a severance package) or choose layoff under the Layoff Benefit Plan provisions. Mr. Flanagan declined all of the options above and accepted employment in June of 2002 with American Isuzu Motors, which is not a General Motors company. We have been advised that Mr. Flanagan did not work for General Motors Isuzu Commercial Truck (GMICT), as GMICT is a limited liability corporation with no employees.

Mr. Flanagan contacted our offices early this year and requested the severance package that he had been offered in 2002. Mr. Flanagan's request was denied, as he had not been employed with GMAC since June of 2002 . . .

The facts detailed above do not support a decision to provide Mr. Flanagan severance benefits as he declined the severance offer and accepted employment with another company. Accordingly, his appeal is denied.

(AR at 293.)

On May 6, 2004, plaintiff's counsel sent a letter to GMAC setting out the aforementioned five pieces of evidence and arguing that he was employed by GMICT, rather than Isuzu. (DSMF at ¶ 35.) On May 26, 2004, GMAC Vice President G.G. Tosch informed plaintiff's counsel that plaintiff had exhausted all of his administrative appeals. Mr. Tosch went on to note, "As stated in my letter of April 8, 2004, Mr. Flanagan left his employment with GMAC and accepted

10

employment with American Isuzu Motors.  Although you point to a number of pieces of correspondence, the records all indicate that while Mr. Flanagan was assigned to GMICT, he was at all times employed by and received his compensation from American Isuzu Motors, an entity distinct from GMAC and General Motors with its own federal tax identification number." (AR at 258.)

### H.   Plaintiff Files Suit

On December 2, 2004, plaintiff filed the Complaint that began the present action. (DSMF at ¶ 1.)  In his Amended Complaint, plaintiff sets forth nine separate causes of action.  In Count I for declaratory relief as to GM, pursuant to 29 U.S.C. § 1132(a)(3), plaintiff seeks a declaration stating, among other things, that he was an employee of GMICT, and, thus, a GM Salaried Employee within the meaning of the GM Salaried Employee Benefit Plans during the relevant time period (June 2002 through December 2003). (Am. Compl. ("Am. Compl.") [3] at 10.)  Count II is a claim for alternative declaratory relief as to GM pursuant to 29 U.S.C. § 1132(a)(3).  In Count II, plaintiff requests that, should the Court hold that plaintiff was not an employee of GMICT, that the Court declare that plaintiff is entitled to GM Separation Allowance Plan ("SAP") benefits or severance pay under the terms of LAP effective in April 2002 when plaintiff left GMAC. (*Id.* at 12.)

Count III is a claim for declaratory relief as to GMAC.

11

Plaintiff asks the Court to hold that GMAC is responsible for the payment of severance benefits to plaintiff as if he had been a GM Salaried Employee with twenty-three years of service, which apparently represents the years of service plaintiff accumulated while at GMAC and GMICT. (*Id.* at 14.)   Count IV is a claim for declaratory relief as to GMICT.   Plaintiff seeks a declaration stating that GMICT is responsible for the payment of severance benefits to plaintiff in accordance with that of a GM Salaried Employee with twenty-three years of service for the years of service plaintiff accumulated while at GMAC and GMICT. (*Id.* at 15.)

Count V is a claim for injunctive relief as to GM pursuant to 29 U.S.C. § 1132(a)(3).   Plaintiff seeks an injunction to require GM to credit plaintiff with the years of service he accrued under the GM Salaried Employee Benefits Plans while employed with GMICT. (*Id.* at 16.)   Count VI is a claim for injunctive relief as to GMICT. Plaintiff seeks an injunction to require GMICT to credit plaintiff with the years of service he accrued under the GM Salaried Employee Benefits Plans while employed with GMICT. (*Id.* at 18.)   Count VII is a claim for injunctive relief as to GMAC brought pursuant to 29 U.S.C. § 1132(a)(3).   Plaintiff seeks an injunction to require GMICT to credit plaintiff with the years of service he accrued under the GM Salaried Employee Benefits Plans while employed with GMICT. (*Id.* at 19.)

AO 72A
(Rev.8/82)

Count VIII is a claim for breach of fiduciary duty brought by plaintiff pursuant to 29 U.S.C. § 1132(a)(3).  Plaintiff contends that "[t]he conduct of Defendants in barring Plaintiff from participating in the GM Salaried Employee Benefit Plans, including the GM Retirement Plan, LAP, LBP and SAP, was a breach of Defendants' fiduciary duty to Plaintiff as a plan participant and in violation of and contrary to the provisions of 29 U.S.C. § 1140. (*Id.* at 21.)

Finally, in Count IX plaintiff claims that defendant GMAC is liable for fraud pursuant to 29 U.S.C. § 1132 and 29 U.S.C. § 1140. Specifically, plaintiff contends that defendants made material misrepresentations of fact that caused plaintiff to reject LAP and LBP benefits. (*Id.* at 23.)  Defendants move for summary judgment on all counts.

## DISCUSSION

### I.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c)).

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits.  Instead, Rule 56 of the Federal Rules of Civil Procedure

13

*mandates* the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id.* at 322-23.

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323; *Apcoa, Inc. v. Fidelity Nat'l Bank*, 906 F.2d 610, 611 (11th Cir. 1990). The movant is not required to negate his opponent's claim, however. The movant may discharge his burden by merely "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. After the movant has carried his burden, the nonmoving party is then required to "go beyond the pleadings" and present competent evidence[7] designating "'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting FED. R. CIV. P. 56(e)). While the court is to view all evidence and factual inferences in a light most favorable to the

---

[7]   The nonmoving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. *Celotex*, 477 U.S. at 324.

14

nonmoving party, *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1236 (11th Cir. 2003), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

A fact is material when it is identified as such by the controlling substantive law. *Id.* at 248. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249-50. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson*, 477 U.S. at 249-50. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of *every* element material to that party's case so as to create a genuine issue for trial.

15

**II.   WHAT RELIEF DOES PLAINTIFF SEEK AND ON WHAT STATUTORY BASIS DOES HE SEEK IT?**

Plaintiff seeks severance compensation from GM, the administrator of GM benefit plans, as a result of his separation from employment with GMAC in May 2002.  The plaintiff also appears to be seeking some sort of severance benefits and/or retirement credit from GM as a result of his employment with, and termination in December 2003 by, Isuzu America.  Plaintiff contends that his right to benefits from GM as a result of his employment with Isuzu America exists because, while at Isuzu America, he worked in the GMICT department, which was purportedly a joint venture between Isuzu America and GM.  Thus, plaintiff seeks credit on his GM retirement account for the 19 months he spent at GMICT.  He also appears to be seeking some sort of severance benefits from GM as a result of his termination by Isuzu America/GMICT.

Candidly, it has been very difficult to identify the particular benefits to which plaintiff believes he is entitled; to discern why he believes that he is entitled to these benefits; or, most significantly, to understand what legal theory would allow him to succeed in his contention. That plaintiff is displeased that he received no severance-type benefits from GM for either termination is obvious, but it is plaintiff's obligation to make clear to this Court why he should prevail.  Yet, from reading plaintiff's response brief,

16

the Court is uncertain as to the legal theory or factual basis that would allow it to award plaintiff benefits, and is also uncertain as to what those precise benefits would be.

The first challenge is to identify the appropriate statutory provision governing plaintiff's claims.  Plaintiff originally brought eight of his nine claims[8] pursuant to 29 U.S.C. § 1132(a)(**3**).  ("§ 3")[9] (emphasis added).  Defendants contend in their motion for summary judgment that, because Counts I through VII are claims seeking entitlement to benefits, these counts arise exclusively under § 502(a)(1)(B) of ERISA, which is found at 29 U.S.C. § 1132(a)(**1)(B)**.("§ (1)(b))[10] (emphasis added)(Defs.' Mot. for Summ. J.

_____

[8]   The ninth Count--Fraud under ERISA-is brought pursuant to § 1132 (with no specification of an applicable subsection) and § 1140.

[9]   § 1132   (a) Persons empowered to bring a civil action

A civil action may be brought--

(3)        by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;

(emphasis added).

[10]   § 1132   (a) Persons empowered to bring a civil action

A civil action may be brought--

17

("Summ. J.") [30] at 17).

Although plaintiff has never sought leave to amend his Complaint to reclassify Counts I through VII as being brought pursuant to § (1)(B), rather than § (3),[11] plaintiff appears to now agree with the defendants as to the applicable statutory sub-section. That is, in his response to defendants' motion for summary judgment, plaintiff states, "Counts One through Seven of the Amended Complaint pray for declaratory, injunctive and actual relief <u>pursuant to Section 502(a)(1)(B)</u> against Defendants for payment of severance benefits under LAP and LBP, and for credit for the years of service with GMICT under the GM Salaried Employee Benefit Plans." (Pl.'s Mem. of Law in Resp. to Defs.' Mot. for Summ. J. ("Resp. Summ. J.") [39] at 16)(emphasis added).

As a procedural matter, plaintiff should have sought leave to

---

      (1)  by a participant or beneficiary--

          (B)  to <u>recover benefits</u> due to him under the terms of his plan, to <u>enforce</u> his <u>rights</u> under the terms of the plan, or to <u>clarify his rights to future benefits</u> under the terms of the plan;

    (emphasis added).

[11]  Plaintiff did amend his Complaint once on December 2, 2004, but, as was true for plaintiff's original Complaint, plaintiff brought Counts I-VIII of his Amended Complaint, pursuant to § (3). (*See* Am. Compl.)

amend his Complaint.[12]  Nevertheless, in the interests of efficiency, and because all parties now contend that plaintiff brings Counts I through VII of his Complaint pursuant to Section 502(a)(1)(B), the Court will simply assume that plaintiff has brought each of these claims pursuant to sub-section (1)(B), rather than sub-section(3).[13]

Further, in determining whether the GM defendants correctly determined that the plaintiff was entitled to no benefits , following his termination from Isuzu America, the parties agree that the Court should apply an arbitrary and capricious standard.[14]

---

[12]   Under FED. R. CIV. P. 15, while plaintiff's first amendment to his Complaint was as of right, a second amendment at this stage of the litigation would require leave of Court.

[13]   Defendants also contend that plaintiff selected the wrong statutory sub-section for Counts VIII and IX.  The Court will discuss this matter when it discusses those counts, *infra*.

[14]   The Eleventh Circuit has established three distinct standards for reviewing the decisions of an ERISA plan administrator: "(1) *de novo* where the plan does not grant the administrator discretion; (2) arbitrary and capricious where the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where there is a conflict of interest." *HCA Health Servs. of Georgia, Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 993 (11th Cir. 2001).  In this case, the parties agree that the plans at issue grant the administrator discretion, and, accordingly, that the applicable standard of review for any claims brought under 29 U.S.C. § 1132(a)(1)(B) is arbitrary and capricious. (Summ. J. at 18-23.)

Plaintiff may have conceded too much.  If GM is the Plan Administrator, it arguably has a financial interest in the outcome of any claims.  Hence, a "heightened arbitrary and capricious" standard might be applicable.  In any event, the result remains the same under either *standard*.

### III.  Request for Severance Benefits As A Result of 2002 Layoff from GMAC[15]

#### A.    Plaintiff's Entitlement to Layoff Alternative Program (LAP)

As noted *supra* at 2, when plaintiff was terminated from GMAC in May 2002, he was offered an opportunity to transfer to another position with GMAC in Dallas, Texas or the option of participating in either the Layoff Alternative Program (LAP) or the Layoff Benefit Plan. (LBP). Because the plaintiff had been working for GMAC for six years, the LAP would have allowed him to continue to receive his salary for five more months after termination.  As plaintiff was earning $4,440 per month, he could have received $22,200 in LAP benefits, had he elected this option.  The LBP would have permitted plaintiff to receive up to 75% of his former salary, as reduced by any salary that plaintiff was receiving from a new employer.

There is no dispute that plaintiff declined the chance to transfer to Dallas.  Further, although in one spot in his response

---

[15]  In the first seven counts of his Complaint, plaintiff seeks to recover severance and other benefits that he contends were triggered either by his termination from GMAC in 2002 or by his termination from Isuzu America on December 31, 2003. As these claims for alternative relief sometimes overlap with each other, the Court will not, as a general rule, refer specifically to a particular count in discussing plaintiff's contentions.   Instead, for ease of discussion, the Court has attempted to divide plaintiff's claims into two categories:  his May, 2002 termination by GMAC and his December, 2003 termination by Isuzu America.  Within those two categories, the Court has attempted, as best the record and briefing permits, to discuss the particular benefits that plaintiff appears to be seeking.

20

brief, plaintiff suggests that he accepted either the LAP or LBP,[16] plaintiff has not supported that assertion with any documentary evidence.  Indeed, plaintiff's real position appears to be that he had initially indicated, orally, that he would like the LAP, but was told by a representative from the Dallas office that he would not be eligible for this benefit if he began working for Isuzu America in the GMICT joint venture.  Accordingly, because he accepted the latter position, he never formally applied for the LAP benefit.  Moreover, had plaintiff actually requested a $22,000 layoff payment in May 2002, but never received that payment, one can expect that he would have made a fuss well before 2004.

Accordingly, the Court concludes that the plaintiff did not elect the LAB benefit when he separated from his position with GMAC

---

[16] "However, Plaintiff did not ...turn down layoff status or layoff benefits under the second two options.  Rather, Plaintiff rejected the Dallas, Texas job, and chose "Layoff" (option two or three), as is reflected by the Administrative Record.  AR 346, AR 340."  (Pl.'s Resp. at 3).

Yet, the record citations provided by plaintiff do not support the above quoted statement.  AR 346 is a computer generated Employee Transaction Report, dated May 30, 2002, which contains biographical and job information about plaintiff.  Perhaps, something on this form indicates that plaintiff chose the LAP, but the Court cannot discern what that might be.  AP 340 is an e-mail, dated March 25, 2004, between two employees at GMAC, which indicates that the plaintiff was offered "LAP and Layoff" when terminated in 2002.  Nothing in this e-mail suggests that plaintiff accepted anything.

in May 2002.[17]   Yet, even though he did not elect LAP in 2002, plaintiff now claims that he should have been given this benefit when he left GMAC's employ in May of that year.

As to the merits of plaintiff's claim that he would have been entitled to the LAP in 2002, defendants note that there was a *quid pro quo* exacted on any employee who elected this benefit. Specifically, in return for receiving his five-month/$22,000 layoff benefit, the plaintiff would have had to agree that he would never seek employment with General Motors, its subsidiaries or affiliates, or companies in which it had an ownership interest.   AR   1.

Defendants speculate that plaintiff may not have requested this LAP because he would not have wanted to incur a permanent bar from employment with these GM-related entities.   (Def.'s Br. [30] at 6 n.4) Defendants contend that, in any event, plaintiff would not have been entitled to the LAP, because, at the time of his separation, he had applied for and received a position with GMICT, a limited liability corporation that was a General Motors affiliate and in which GM held a 49% ownership interest.   (Def.'s Reply [42] at 6).

The Court cannot determine what plaintiff's legal contention is as to the accuracy of defendants' assertion that GMICT was an

---

[17]   The Court will address plaintiff's complaint about the oral information provided about the availability of the LAP, *infra* at 40.

22

affiliate of GM's, meaning that employment with GMICT would have prevented plaintiff from seeking the LAP and vice-versa. The plaintiff correctly notes that the defendants never offer a definition of "affiliate" or of "company in which GM has an ownership interest," either in its plan materials or in its briefs to this Court (Resp. DSMF [39] at 18). Although the former phrase is not self-explanatory, the latter would appear to be. In that regard, defendants have averred that GM owned a 49% interest in GMICT. (DSMF [30] at ¶ 21). Plaintiff, however, has indicated that he can neither admit nor deny that fact, as he has had no discovery. (Resp. DSMF [39] at ¶ 21).

The plaintiff also notes, persuasively, that there seems to be some inconsistency between defendants' positions in this litigation. That is, in contending that plaintiff is entitled to no benefits following his termination in 2003 from Isuzu America, in its GMICT department, defendants argue that plaintiff did not work for GMICT because, as a joint venture composed of employees from two different companies, GMICT had no employees. Hence, performing duties for that entity conferred no status on plaintiff as a GM employee. Yet, in arguing that plaintiff was not entitled to LAP benefits when he was terminated from GMAC in 2002, because his subsequent job was with an affiliated company or a company in which GM had an interest, defendants argue that plaintiff did work for GMICT. (Pl.'s Resp. [39]

AO 72A
(Rev.8/82)

at 23).

Where the plaintiff ultimately comes down on this question, and how he arrives there, is unclear to this Court. Presumably, plaintiff seeks the greatest benefits possible, which presumably would arise were he to be considered a GM employee, even after GMAC terminated him in 2002 and he then began working for Isuzu America. That argument would doom his claim to LAP benefits in 2002, however.

Whatever the merits of plaintiff's potential entitlement to the LAP in 2002, plaintiff loses on this claim because he never elected to receive the LAP while he was employed by GMAC. Moreover, as defendants correctly note, the LAP expired, by its own terms, on December 31, 2002. (Def.'s Brief [30] at 9-10; AR 1). Yet, plaintiff did not apply for these benefits until 2004, at a time when the program had already expired. Accordingly, for this reason, the Court concludes that plaintiff is not entitled to LAP benefits as a result of his termination from GMAC in 2002, and it **GRANTS** summary judgment to the defendants GM and GMAC[18] on this discrete claim.

**B.   Plaintiff's Entitlement to Layoff Benefit Program (LBP)**

As discussed *supra* at 2-4, plaintiff was also entitled to participate in the Layoff Benefit Program (LBP). Under that program, a laid-off employee with less than ten years service could receive

_____

[18]   Defendant GMICT is presumably not a defendant as to any claims for benefits made in connection with the 2002 termination.

benefits totaling up to 75% of his previous salary for the first six-month period following his termination and up to 65% of that salary for the second six-month period.

The Court assumes that an employee could elect either the LBP or the LAP, but not both.  See AR 293. Also, unlike the LAP, receipt of the LBP does not appear to bar an employee from seeking employment with GM entities in the future.  Yet, as defendants note, employment during the 12 month period following termination could impact the actual benefits received under the LBP.

Specifically, a laid-off employee could receive a monthly benefit, for the first six months, which, when added together with 75% of compensation received from any other employer, totals 75% of his former salary at GMAC.  During the second six months of LBP entitlement, the monthly layoff benefit drops to an amount which, when added together with 75% of any other compensation received, would total 60% of the employee's former monthly base salary.

As defendants note, because plaintiff received a pay increase when he began working for Isuzu America, he was entitled to no LBP benefits from GMAC, under the above formula. Specifically, plaintiff received a salary of $4,400 per month at the time he left the employ of GMAC; he received a salary of $5922.92 per month when he joined Isuzu America.  Under the LBP, plaintiff was entitled to benefits which, when added together with 75% of any other compensation, would

25

equal 75% of his former base salary at GMAC.  Seventy-five percent of
$4,400, the former salary, is $3,300.  Plaintiff, however, was
earning $5922.92 in his new job. Seventy-five percent of that figure
is 4442.19.  Accordingly, given the salary being earned by the
plaintiff in his new job, he would have been entitled to <u>no</u> benefits
under the LBP.

Plaintiff complains that the defendants did not articulate this
precise argument when declining his request for benefits in 2004.  As
defendants note, however, in making his request for benefits,
plaintiff has not been precise or clear about the benefits that he
sought, or the basis thereof.  (Def.'s Reply [42] at 9-10).  In
essence, defendants declined plaintiff's request for layoff benefits
on the ground that plaintiff was applying in 2004 for severance
benefits, when plaintiff had not worked for the company since May of
2002. *Id.*

Whatever the defendants may have said when they declined to
award plaintiff benefits in 2004, the fact of the matter is that
plaintiff does not contest his lack of entitlement to LBP benefits in
2002, under the formula in place and given his subsequent employment
at a higher salary at Isuzu America.  Moreover, plaintiff cites to
nothing in the record that would suggest that he ever requested any
benefits under the LBP during the 12 month period following his
termination.  Perhaps, his failure to ask for these benefits is

26

because he had read the plan and knew that his salary at his new job was too high to permit him to receive any benefits. At any rate, any award of LBP benefits to plaintiff by defendants, as a result of his termination by GMAC in 2002, would have violated the formula established in the plan and would have been an arbitrary and capricious act.  Therefore, the Court **GRANTS** defendants GM and GMAC summary judgment as to plaintiff's claim for LBP benefits following his termination by GMAC in 2002.

C.    **Plaintiff's Entitlement to Separation Allowance Plan (SAP) Benefits**

Although, in his Amended Complaint, plaintiff cites his right to SAR benefits following his termination by GMAC in 2002 (Am.Comp. [3] at ¶ 60), he does not discuss this benefit in his response brief. Moreover, in that same brief, plaintiff indicates that he appealed GMAC's denial of benefits "under LAP and LBP," with no mention of any appeal of a denial of SAR benefits.   (Pl.'s Resp. [39] at 13). Hence, the Court is unsure if plaintiff is pursuing this benefit here, or if he preserved his right to do so.

Even if plaintiff were pursuing an SAR benefit following his termination in 2002, defendants' argument that plaintiff would not have been entitled to this benefit appears irrefutable.  According to defendants, an employee is not entitled to a separation allowance if he "quit."  The Employee Handbook indicates that an employee quits,

27

if he is on layoff status and does not accept a suitable offer of reemployment. *See generally* Defs.' Reply [42] at 7-8. As GMAC offered plaintiff a position in Dallas when he was laid off in 2002 and as he admits that he declined that position, this Court does not understand how plaintiff could claim any entitlement to an SAR benefit as a result of this 2002 termination. Accordingly, the Court **GRANTS** defendants GM and GMAC's motion for summary judgment as to any claim by plaintiff for an SAR benefit following his termination by GMAC in 2002.

## IV.   REQUEST FOR SEVERANCE BENEFITS AND RETIREMENT CREDIT AS A RESULT OF 2003 LAYOFF FROM ISUZU AMERICA

### A.   Was Plaintiff Still a GM Employee and a Participant in GM Benefit Plans After Being Hired by Isuzu America?

Although he was hired by Isuzu America in June 2002 and terminated from that company on December 31, 2003, plaintiff nevertheless contends that he was still a GM employee[19] during that period of time and, hence, was entitled to have all service while at Isuzu America credited toward his GM retirement plan, which had earlier vested when he was previously employed by GMAC. Further, plaintiff contends that, once terminated by Isuzu America, he was entitled to any severance benefits that would have been available to

---

[19]   The Court assumes that GMAC is a wholly-owned subsidiary of GM. If so, the Court is not sure whether the plaintiff is contending that he was still a GMAC employee or just a generic GM employee while employed with Isuzu America in its GMICT "department."

28

a GM employee.

As plaintiff was clearly hired and his salary paid by Isuzu America, not by any GM entity, his argument seems rather odd. Yet, plaintiff contends that, while he may have been hired and paid by Isuzu America, he was actually detailed to work at GMICT, which was purportedly a joint venture including GM and Isuzu America employees. In essence, plaintiff is necessarily contending that an employee "of" a joint venture is, for benefits purposes, either an employee of the joint venture or an employee of <u>both</u>[20] companies that contribute employees to the venture. Plaintiff has cited no legal authority in support of this general proposition, however, nor any support for the implicit proposition that one can be simultaneously an employee of two separate employers. Moreover, plaintiff has not indicated whether GMICT, the company that he insists was his employer, even operated a benefits program.[21]    If it did not, plaintiff must

---

[20]   Plaintiff also apparently believed that he could participate in Isuzu America's own benefit plans as he initially accepted, and then rejected, the severance benefits offered by Isuzu America in 2004.  Plaintiff has conceded that he participated in other benefit plans offered by Isuzu America, such as health plans, during his nineteen-month tenure there.  *Supra* at 8.

[21]   Plaintiff's omission here is perhaps understandable as plaintiff has had no opportunity for discovery.  Yet, had GMICT operated its own benefits plan, one would think that plaintiff would have known this as he likely would have been a participant, at least, in the health plan that such an entity would have operated.  That plaintiff participated in plans administered by Isuzu America suggests that GMICT offered no employee benefit plans.

demonstrate why he contends he should be allowed to participate in a severance benefits program that was offered by a previous employer. Alternatively, plaintiff must demonstrate what provisions in any GM benefits plan would confer severance or other employment benefits on a GMICT employee, hired by an entity other than GM.

Defendants' position is that GMICT was a limited liability corporation, 51% of which was owned by Isuzu entities and 49% of which was owned by GM. Defendants further contend that, as a limited liability corporation, GMICT necessarily had no employees. In support of that contention, the Administrative Record contains an affidavit from a Vice-President of Operations at Isuzu America, who indicates that GMICT was a limited liability corporation, in which Isuzu entities were a majority owner and GM was a minority owner. AR 707. As to the precise breakdown of ownership interests, the Court has found nothing in the record other than a hand-written note written by a Human Resources representative from GMAC (AR 337), which information was presumably conveyed to him from someone not identified in the record.

With regard to defendants' contention that a limited liability corporation has no employees--and hence could offer no benefits plan--defendants have offered no legal authority. Further, defendants have provided no explanation of how the benefits program is administered to people who work for GMICT. That is, do they

receive benefits from the company that hired them--either GM or Isuzu--or do they have their own benefits plan?  In short, knowledge of how GM and Isuzu set up GMICT, in terms of employee benefits, would help the Court decipher the structure under which GMICT operated.

As noted, *supra* at 5-6, plaintiff points to five pieces of "evidence" that he contends establish that he was an employee of GMICT, or that at least create an issue of fact on that matter.[22] Also, as noted, defendants rely on three pieces of evidence in support of their contention that plaintiff was an employee of Isuzu when terminated.[23]

While both sides argue about the inferences to be drawn from this evidence, neither party offers what is crucial in any legal determination of this question: that is, an operative legal standard against which to evaluate the evidence.  That is, how does GM's Salaried Employee Benefits Plan define an employee?  Is there any language that addresses the situation of a person hired by another

---

[22]  This evidence is a GM National Benefit Center notice; an inter-office memorandum; his May 2002 acceptance letter; a letter distributing bonuses for 2002; and his GMICT business card as proof that he was an employee of GMICT from June 2002 through December 2003.

[23]  This evidence is: plaintiff's May 2002 acceptance letter; plaintiff's W-2 forms and payroll checks; and plaintiff's participation in Isuzu benefit plans.

corporate entity, but working for a joint venture partially owned by GM? As a benefits plan is essentially a contract between an employer and an employee, it would have been useful for plaintiff to have provided the Court with the specific provisions in the GM plan that plaintiff relies on in arguing that the severance benefits under the plan were still available to him, even when he began working for Isuzu America and GMICT. As plaintiff is the party with the burden of demonstrating, at the outset, his entitlement to participate in a benefits plan for an employer that he no longer directly works for, an absence of proof on the question means that the plaintiff has failed to demonstrate his entitlement to any benefits of that employer's plan and has, therefore, failed to show that the defendants' decision on his claim was arbitrary and capricious.

With regard to plaintiff's alleged entitlement to credit toward his GM retirement account for the nineteen months he spent at Isuzu America/GMICT, defendants did provide the operative language in the GM retirement plan that defines the kind of employment that counts toward retirement credit. *See* Def.'s Reply [42] at 11-12. The pertinent provision indicates that "credited service" includes all employment "with General Motors Corporation or its directly or indirectly wholly-owned or *substantially wholly-owned* domestic or foreign <u>subsidiaries</u> in accordance with I.R.C. Section 414(b),(c),

32

(m), (n) and (o)...." *Id.* at 12, citing AR 92.   Defendants argue that this provision demonstrates that plaintiff's service with GMICT should not count toward his earlier vested GM retirement because GMICT was not wholly owned or substantially wholly-owned by GM.   The referenced language is not self-defining, however, and the Court does not know what the latter phrase means.   Defendants have told the Court that GM owned 49% of GMICT.   Could that mean that GMICT is a "substantially" wholly-owned subsidiary of GM, or does substantial require more than 50% ownership?   Neither party explains this to the Court, or attempts to cite any case law or other authority.

Further, adding to the confusion is the inconsistent manner in which defendant GMAC has dealt with this issue.   As plaintiff has noted, GMAC sent plaintiff a notification, while plaintiff was employed by Isuzu America/GMICT, indicating that plaintiff was being credited, on his GM retirement account, for his service while working for GMICT.   Defendants now state that this was a mistake, but have offered no explanation as to how this mistake was made.   If just a clerical or computer mistake, the error is without significance; if, however, this notification reflects uncertainty on GM's part as to the applicability of its retirement plan to GMICT's employees, then this is a matter that should be explored further.

Second, as noted *supra* at 23, defendants have been inconsistent about whether plaintiff worked for GMICT or for Isuzu America.   For

33

purposes of determining whether plaintiff was entitled to LAP benefits in 2002, defendants argue that plaintiff was working for GMICT. Yet, for purposes of determining whether plaintiff was entitled to severance benefits in 2004, defendants contend, in part, that plaintiff was not working for GMICT because the latter was a limited-liability company that had no employees.

In short, on the record before it, the Court cannot determine whether plaintiff was covered by GM's retirement program and, hence, it cannot determine whether GM's denial of retirement credit for plaintiff was an arbitrary and capricious decision. Accordingly, that uncertainty means that the Court cannot grant summary judgment to the defendants as to the claim for retirement benefits accrued as a result of plaintiff's employment with Isuzu America/GMICT.

With regard to plaintiff's claim for unspecified severance benefits from GM, upon plaintiff's termination by Isuzu America/GMICT, plaintiff has offered no persuasive evidence or argument to explain why the Court should conclude that plaintiff was covered by GM's Salaried Employee Benefits Plan after he left GMAC. Normally, this would prompt the Court to grant the defendants' motion for summary judgment on this claim. Nevertheless, the plaintiff continues to complain that he had no discovery to uncover information concerning the accuracy of the factual averments made by defendants with regard to this issue. In

34

the interest of fairness, the Court will allow plaintiff such discovery on both the retirement and severance claims. *See* discussion *infra*. Thereafter, the defendants can renew their motion for summary judgment. Accordingly, the Court **DENIES** summary judgment to defendants on plaintiff's claims for severance benefits that he allegedly earned while employed by Isuzu America/GMICT.

## B.    The Need for Discovery on the Above Matters

When a motion for summary judgment is denied, a case is set for trial. An ERISA case receives a bench trial. Further, as the Court will be limited to the Administrative Record, which record clearly does not contain the answers necessary to determine whether the defendant GM's decision to deny benefits following the 2003 termination was correct, no purpose would be served by holding a trial.

Plaintiff had previously sought discovery, and the Court had granted defendants' motion to quash any such discovery, as a court is expected to look only to the administrative record before it, in resolving an ERISA dispute. Given the uncertainties articulated above and the Court's own inability to resolve the question before it on the present record, the Court now revisits that decision and will permit plaintiff a period of discovery to answer some of these factual questions. Likewise, to the extent that it might be helpful, the defendants will be permitted to conduct discovery as well.

35

The Court cautions both parties, however, that the Court will not be aided by a presentation of facts unless those facts are tied to an operative legal principle by which the Court can gauge the significance of the proffered evidence. In short, the Court expects more helpful briefing should the case return to it for disposition.

Finally, while the Court will allow the plaintiff discovery on these matters, the Court does not wish the plaintiff to infer that the Court is encouraging this discovery, at least on the severance benefits claim. Plaintiff left the employ of GMAC and went to work for an entirely different corporate entity that paid plaintiff's salary, provided plaintiff with benefits, and offered plaintiff severance pay when it terminated him. Certainly, up until the time that he was terminated, plaintiff never acted in a manner that would have suggested that he believed he was still covered by GM's employee benefit plan. Indeed, he participated in and accepted benefits from Isuzu America. Under those facts, the Court would be greatly surprised if any amount of discovery or briefing will lead to a conclusion that plaintiff was covered by those plans. Nevertheless, the Court will allow the plaintiff license to conduct reasonable and focused discovery on these matters, if plaintiff is willing to incur expenses that may never be recouped.

Upon the conclusion of discovery, this case can take one of two routes. Either (1) it will return to the Court for a renewed motion

36

for summary judgment or a bench trial or (2) the case will be remanded to the defendant fiduciary to review the plaintiff's claim on an expanded record as to the post-2003 benefits claim. On such a remand, the defendant will be expected to give a fuller and more coherent explanation, should it decide to deny the plaintiff's claim.

As the defendants have noted, a reviewing court may only consider the information available to the administrative committee when determining whether the committee acted arbitrarily and capriciously. *Paramore v. Delta Air Line, Inc.,* 129 F.3d 1446 (11th Cir. 1997). For that reason, this case may well be remanded following the conclusion of discovery. To the extent, however, that the present confusion can be remedied by more thorough briefing in the next round or by a review of documents that were available to the Committee upon its initial review,[24] there is a possibility that the Court could resolve the case without the need for a remand.

The Court will allow the parties a **sixty (60) day** period of discovery, beginning on **October 9, 2006**. Any motions for summary judgment should be filed by **Friday, January 12, 2007**. If neither party files a motion for summary judgment, each party shall file a

---

[24] According to plaintiff, who cites *Jett v. Blue Cross and Blue Shield of Alabama, Inc.,* 890 F.2d 1137 (11th Cir. 1989), the Court is not limited to the Administrative Record, but may also consider documents that were available to the Plan Administrator at the time it made its decision. (Pl.'s Resp. [39] at 20.)

pleading, by **January 17, 2007,** indicating what issues remain to be tried at a bench trial or indicating the party's position as to whether the dispute should be remanded to the administrative committee to further develop the record.   If only one party files a motion for summary judgment, the responding party shall likewise address whether the case should be remanded or, if not, the party shall identify the precise factual issues that remain to be tried.

## V.    COUNT VIII: BREACH OF FIDUCIARY DUTY

In Count VIII, the plaintiff contends that the defendants breached their fiduciary duty when they denied him the claimed benefits.   Defendants seek summary judgment as to Count VIII.[25] Defendants contend that plaintiff's claim for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3) cannot be maintained because plaintiff has an adequate remedy under 29 U.S.C. § 1132(a)(1)(B). Under controlling Supreme Court and Eleventh Circuit law, when a remedy is available under another section of ERISA, equitable relief under 29 U.S.C. § 1132(a)(3) is not available. (Summ. J. at 26.)

---

[25]   In their motion for summary judgment, defendants confuse their discussion of Counts VIII and IX of plaintiff's Complaint.   On page 15 of their motion for summary judgment, defendants correctly refer to Count VIII as plaintiff's claim for breach of fiduciary duty and Count IX as plaintiff's claim for fraud under ERISA.   On page 17, defendants switch the two counts and begin to incorrectly refer to Count VIII as plaintiff's claim for fraud and Count IX as plaintiff's claim for breach of fiduciary duty.   This same error reappears in defendants' reply brief. (Defs.' Reply Br. in Supp. of Mot. for Summ. J. ("Reply") [42] at 12.)

AO 72A
(Rev.8/82)

*See, e.g., Ogden v. Blue Bell Creameries U.S.A., Inc.*, 348 F.3d 1284, 1287 (11th Cir. 2003) ("Section 502(a)(3) relief is only appropriate in situations where Section 502(a)(1)(B) does not afford an ERISA plaintiff with an adequate remedy . . .;" *Katz v. Comprehensive Plan of Group Ins., Alltel*, 197 F.3d 1084, 1088 (11th Cir. 1999)("an ERISA plaintiff with an adequate remedy under § 1132(a)(1)(B), cannot alternatively plead and proceed under § 1132(a)(3)").

Defendants are correct.    Plaintiff's claim that defendants violated their fiduciary duties by not giving him certain benefits is just another way of asking for those benefits.    Section 1132(a)(1)(B) permits a person to bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights..., or to clarify his rights to future benefits...." Indeed, the Court's earlier discussion has focused on plaintiff's efforts to recover benefits that he believes to be due to him.    If the Court concludes that no benefits were due to plaintiff, as alleged in Counts I-VI, then necessarily the defendants would have violated no fiduciary duty (Count VIII) by denying these benefits. Conversely, if the Court concluded that the plaintiff was entitled to certain benefits, then the Court would give the appropriate relief and no good purpose would be served by also declaring that the defendants had violated their fiduciary duty when they denied these benefits.

39

For the above reasons, the Court **GRANTS** defendants' Motion for summary judgment as to Count VIII.

## VI.   COUNT IX: FRAUD

In Count IX, the plaintiff contends that the defendants committed fraud on the plaintiff.  Specifically, the plaintiff avers that GMAC employees, Jerry Galvin and Jim Nagy, made material misrepresentations to plaintiff in May 2002 concerning the relationship between GMAC and GMICT, at a time when plaintiff was deciding whether to accept lay-off benefits and/or whether to accept Isuzu America/GMICT's offer of employment.  Plaintiff avers that he relied to his detriment on these misrepresentations.

Defendants seek summary judgment as to Count IX, noting that a claim for fraud is a state law claim which has been preempted by ERISA's statutory framework. (Summ. J. at 15.)   In his response to defendants' motion for summary judgment, plaintiff counters defendants' arguments for summary judgment on Counts I through VIII, but does not specifically respond to defendants' motion for summary judgment on Count IX.   Further, well-established case law provides that ERISA, "pre-empts state common law tort and contract actions asserting improper processing of a claim for benefits under an insured employee benefit plan." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 43 (1987); *see also Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58 (1987); *Hall v. Blue Cross/Blue Shield of Alabama*, 134 F.3d 1063

40

(11th Cir. 1998); *Sanson v. General Motors Corp.*, 966 F.2d 618 (11th Cir. 1992); *Phillips v. Amoco Oil Co.*, 799 F.2d 1464 (11th Cir. 1986).

Because fraud is a common law tort action preempted by ERISA and because plaintiff did not specifically respond to defendants' motion for summary judgment as to Count IX, the Court would be justified in granting summary judgment on those grounds. Nevertheless, although plaintiff does not respond directly, plaintiff does continue to complain about the alleged misrepresentations in his response. Moreover, while a claim of fraud may not be actionable in an ERISA action, a related claim of promissory estoppel is potentially actionable as a claim for a violation of fiduciary duty. *Jones v. American General Life and Acc. Ins. Co,* 370 F.3d 1065, 1069 (11th Cir. 2004). Moreover, plaintiff does use the term "breach of fiduciary duty" once in his fraud claim. *See* Am. Comp. [3] at ¶ 109. As both the defendants and the plaintiff have briefed the significance of the alleged misrepresentations, the Court will treat this claim as one for promissory estoppel, in breach of the defendants' fiduciary duty.

Even so recast, however, plaintiff still loses on this claim. As the Court understands plaintiff's argument, he is contending that GMAC employees, Jerry Galvin and Jim Nagy, incorrectly told him that he could not receive LAP benefits, upon his termination from GMAC in

41

2002, if he took a position with GMICT. Their reasoning was that GMICT was an affiliated company of GM's or of GMAC's and, under the terms of the benefit plan, a recipient of LAP benefits could not seek or accept a position with an affiliated company.

The conduct about which plaintiff complains, however, is very distinguishable from that described in *Jones*, in which a valid claim of promissory estoppel was recognized by the Eleventh Circuit. In *Jones*, management officials of the employer had consistently, repeatedly, and for many years informed their potential and current employees that, when they retired, they would be allowed to continue their health care coverage. This was a powerful incentive to attract and retain employees, who relied on this representation when they accepted or continued employment with the employer. Subsequently, however, the employer discontinued this health coverage for retirees. Its decision was ratified by the Court of Appeals because, in the fine print of the plan, there was a provision that the reviewing court concluded would allow them to do so, notwithstanding other provisions that suggested that the employees would be allowed to continue their health coverage after retirement. *Jones*, 370 F.3d at 1070.

The first distinction between this case and *Jones* is the identity of the purveyors of the misrepresentation. As noted, in *Jones*, management of the company consistently made the oral

42

misrepresentations.   Here, the individuals who informed plaintiff that he would not be able to accept LAP benefits if he accepted a job with GMICT were individuals from the Dallas GMAC office who were discussing with plaintiff the possibility of him transferring there, instead of being laid off.   Clearly, these individuals had no authority or discernable expertise that would allow them to speak dispositively about how the company's severance package operated.   If this was a important matter for the plaintiff, he should have consulted with an administrator of the plan or someone within in the Company who would have some authority to speak as to the terms of the plan.

Second, as defendants argues, plaintiff has not shown that the representations were untrue.   As noted, a recipient of LAP could never seek employment with General Motors, its subsidiaries or affiliates, or companies in which it had an ownership interest. Whatever the definition of "affiliates," GM did partially own GMICT, which, according to the terms of the plan, arguably indicated that the plaintiff could not work for GMICT after receiving LAP benefits.

Third, whether true or untrue, plaintiff did not rely to his detriment on the representation.   Relying to one's detriment on a representation means that one would have made a different decision had the representation not been made.   Yet, here, plaintiff was clearly going to accept the job with GMICT whether or not he would

43

have been able to receive LAP thereafter.  That is, when plaintiff believed that he would <u>not</u> receive LAP if he joined GMICT, he nonetheless decided to forego the LAP and take the job with GMICT anyway.  This was obviously a rational decision, as the LAP would have paid the plaintiff $22,000, but he would have been left without a job at the end of that five-month period and would have never been able to apply for a GM job again.  The promise of a permanent job at $70,000 a year was understandably more attractive to the plaintiff than acceptance of a $22,000 severance benefit, to be followed by no job.

Conversely, if plaintiff had been able to accept the GMICT job and still receive the LAP benefits, obviously he would have made the same decision: to accept the GMICT job.  Accordingly, either way, with or without the representation, plaintiff was going to accept a job with GMICT.

Perhaps, plaintiff is really arguing that, because of Nagy and Galvin's representations, he did not timely seek the LAP, which benefit he now contends was due him, even though he worked for GMICT. Yet, these men's representation cannot be considered to be the cause of plaintiff's failure to seek this benefit.  He was free to accept the job with GMICT and then file a timely claim for the LAP.  If he was entitled to the benefit, he would have received it.  That he chose not to do so, instead relying on the passing comments of people

44

who had no authority to speak about the scope of the benefits plan, is his own fault.  Nothing ventured, nothing gained.

In short, the Court **GRANTS** defendants' motion for summary judgment as to Count IX.

### CONCLUSION

For the foregoing reasons, the Court **DENIES in part and GRANTS in part** Defendants' Motion for Summary Judgment [30].  Discovery shall be reopened, effective **October 9, 2006** and shall extend for **sixty (60) days** thereafter.  The parties shall file a motion for summary judgment by **Friday, January 12, 2007**.  If neither party files a motion for summary judgment, each party shall file a pleading, by **January 17, 2007,** indicating what issues remain to be tried at a bench trial or indicating the party's position as to whether the dispute should be remanded to the administrative committee to further develop the record.   In only one party files a motion for summary judgment, the responding party shall likewise address whether the case should be remanded or, if not, the party shall identify the precise factual issues that remain to be tried.

SO ORDERED, this _27_ day of September, 2006.


JULIE E. CARNES
UNITED STATES DISTRICT JUDGE


45

AO 72A
(Rev.8/82)